## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| SUSANA KASZIRER, Derivatively on Behalf of Nominal Defendant SOLARIS ENERGY INFRASTRUCTURE, INC., <br><br> Plaintiff, <br><br> v. <br><br> WILLIAM A. ZARTLER, KYLE S. RAMACHANDRAN, AMANDA M. BROCK, CYNTHIA M. DURRETT, JAMES R. BURKE, LAURIE H. ARGO, EDGAR R. GIESINGER, W. HOWARD KEENAN JR., A. JAMES TEAGUE, RAY N. WALKER JR., and M. MAX YZAGUIRRE, <br><br> Defendants, <br><br> and <br><br> SOLARIS ENERGY INFRASTRUCTURE, INC., <br><br> Nominal Defendant. | Case No. <br><br> **<u>JURY TRIAL DEMANDED</u>** |

## <u>PLAINTIFF'S ORIGINAL DERIVATIVE COMPLAINT</u>

By and through her undersigned counsel, Plaintiff Susana Kaszirer ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant Solaris Energy Infrastructure, Inc. ("Solaris" or the "Company") and against certain current and former officers and directors of the Company for violations of section 14(a) of the Exchange Act, contribution under section 10(b) of the Exchange Act, Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act, insider trading and misappropriation of information, breaches of fiduciary duties, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. Plaintiff makes

1

these allegations upon personal knowledge as to those allegations concerning herself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by Solaris and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on Solaris' website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related consolidated securities fraud class action lawsuit captioned *Pirello et al. v. Solaris Energy Infrastructure, Inc., et al., Case No. 25-cv-01455 (S.D. Tex.)* (the "Related Securities Action"); and (e) review of other publicly available information concerning Solaris and the Defendants.

## NATURE OF THE ACTION

1.     Plaintiff brings this action derivatively for the benefit of Nominal Defendant Solaris against certain of the Company's current and former executive officers and directors aiming to rectify the Defendants' breaches of fiduciary duties for issuing false and misleading statements and/or omitting material information in the Company's public filings and proxy statements from approximately July 9, 2024, to the present (the "Relevant Period").[1]

2.     Solaris is an equipment-based energy solutions company serving the oil and gas industry throughout the United States. The Company's services are used for power generation and management of raw materials used in the completion of oil and natural gas wells.

---

[1] The materially misleading statements and/or omissions were issued in the Company's financial reports and other public filings and releases from approximately July 9, 2024, to March 17, 2025; however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

3.     On July 9, 2024, the Company issued a press release (the "July 9 Press Release") to announce that it had entered into an agreement to acquire Mobile Energy Rentals LLC ("MER"), a turbine leasing company described by Solaris to be a "premier provider of distributed power solutions." The sale closed on September 11, 2024, whereupon Solaris paid approximately $60 million in cash in exchange for 16.5 million shares of MER common stock, as well as a repayment of approximately $71 million to cover MER's existing debt. MER was subsequently rebranded as the "Power Solutions" segment of Solaris.

4.     The Company claimed that the acquisition of MER would help to grow the Company. For instance, in the Company's March 5, 2025 Form 10-K for the fiscal year 2024 (the "2024 Form 10-K"), the Company descried its acquisition of MER as "an entry into the large and growing distributed power solutions market, both enhancing our position as a mobile equipment and logistics solution provider to the oil and gas industry and also diversifying our end market exposure."

5.     The Company's bullish projections were short-lived, however, as on March 17, 2025, Morpheus Research published an investigative report (the "Morpheus Research Report") titled "Solaris Energy Infrastructure: How A Crumbling Texas Oilfield Services Company Gambled It All On A Convicted Felon And The World's Richest Man." The Morpheus Research Report revealed troubling facts about MER's track record and experience as a turbine leasing company, including that MER had only acquired its turbines within months prior to its acquisition by Solaris. The Company's CEO, Defendant Zartler, had made public representations about his familiarity with MER's management, describing them as a "cultural and operational fit," in addition to touting MER's business as "highly complimentary" to that of Solaris.

6.     On the contrary it turns out that one of MER's co-owners, John Tuma ("Tuma"), had been previously implicated in turbine-related fraud and even had a felony conviction for environmental crimes. Additionally, the Morpheus Report revealed that MER, contrary to assurances made to investors, derived 96% of its revenue from just one client as opposed to having a "contracted and diversified earnings stream." The Morpheus Research Report even went so far as to described MER as "a ~$2.5 million revenue equipment leasing business based out of a condo with zero employees, no turbines, and no track record in the mobile turbine rental industry."

7.     Investors reacted poorly to the Morpheus Research Report, and Solaris' stock price fell by $4.15—or 16.9%—to close at $20.46 per share on March 17, 2025, on unusually heavy trading volume.

8.     Defendants made materially false and/or misleading statements throughout the Relevant Period and failed to disclose material adverse facts regarding MER, its management, and its business. Specifically, the Individual Defendants mislead the investing public by misrepresenting and/or failing to disclose that: (i) MER lacked the track record or experience in the turbine leasing industry that MER was touted to have; (ii) MER's earnings stream was not diversified, and actually came predominantly from only one client; (iii) MER's co-owner John Tuma had a history of turbine-related fraud and a felony conviction for environmental crimes despite assurances from the Company that MER's management was a "cultural and operational fit;" (iv) Solaris overstated the positive impact that the acquisition of MER would have on the Company as a result of the foregoing undisclosed issues; and (v) Solaris overstated its total assets and near-term profitability in its financial reports as a result of the Company's failure to properly depreciate MER's turbines in accordance with industry standards. As a result of the foregoing, the

Individual Defendants caused the Company to issue public statements and disclosures that were materially false and/or misleading during the Relevant Period.

9.      In addition, the Individual Defendants breached their fiduciary duties by causing Solaris to repurchase its own stock at artificially inflated prices during the Relevant Period. Between November 2024 and March 2025, the Company repurchased 300,197 shares of its common stock, costing the Company approximately $10.2 million. Defendants' material misrepresentations are responsible for Solaris' stock trading at inflated prices, and when the truth was revealed, those prices declined to $20.46 per share when markets closed on March 17, 2025, representing an overpayment of around $4 million attributable to the Company's Relevant period stock repurchases.

10.      Furthermore, four of the Individual Defendants—Defendants Zartler, Ramachandran, Durrett, and Keenan—engaged in illicit insider sales of the Company's stock during the Relevant Period, netting proceeds of over $27.9 million as a result of the Company's insufficient internal controls.

11.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and the Company have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.      This Court has jurisdiction over this action pursuant to the subject matter of this action pursuant to 28 U.S.C. § 1331 because the claims arise under and pursuant to §10(b) of the Exchange Act and Rule 10(b)-5 promulgated thereunder.

13.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a), as they relate to Plaintiff's claims under 15 U.S.C. §78n(a).

14.    Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation within this district by doing business here and engaging in numerous activities that had an effect in this jurisdiction.

## PARTIES

### A.    Plaintiff

15.    Plaintiff was a shareholder during the Relevant Period, and has continuously been a shareholder of Solaris common stock.

### B.    Nominal Defendant

16.    Nominal Defendant Solaris is incorporated in Delaware and its current principal executive offices are located at 9651 Katy Freeway, Suite 300, Houston, Texas, 77024. The Company's common stock trades on the New York Stock Exchange (the "NYSE") under the ticker symbol "SEI."

### C.    Defendants

17.    Defendant William A. Zartler ("Zartler") serves as the co-Chief Executive Officer ("CEO") of Solaris and is Chairman of the Company's Board of Directors (the "Board"). For the fiscal year of 2024, Zartler received $3,820,166 in total compensation.[2] Defendant Zartler is named as a defendant in the Related Securities Action.

18.    Defendant Kyle S. Ramachandran ("Ramachandran") has served as the Chief Financial Officer ("CFO") since 2017 and the Company's President since 2018. For the fiscal year

---

[2] Includes salary, stock awards, option awards, non-equity incentive plan compensation and all other compensation.

of 2024, Ramachandran received $1,954,279 in total compensation. Defendant Ramachandran is named as a defendant in the Related Securities Action.

19.    Defendants Zartler and Ramachandran are referred to collectively herein as the "Securities Action Defendants."

20.    Defendant Amanda M. Brock ("Brock") has served as the co-CEO of Solaris since October 16, 2025, and is a member of the Board of Directors.

21.    Defendant Cynthia M. Durrett ("Durrett") has served as the Chief Administrative Officer of Solaris since 2017 and has been a member of the Board since March 2019. For the fiscal year of 2024, Durrett received $1,233,340 in total compensation.

22.    Defendants Brock and Durrett, in addition to the Securities Action Defendants, are collectively referred to herein as the "Officer Defendants."

23.    Defendant James R. Burke ("Burke") has been a member of the Board since May 2017. Defendant Burke is a member of the Nominating and Governance Committee. For the fiscal year of 2024, Burke received $216,310 in total compensation.

24.    Defendant Laurie H. Argo ("Argo") has been a member of the Board since March 2022. Defendant Argo is the Chair of the Nominating and Governance Committee, as well as a member of both the Audit Committee and Compensation Committee. For the fiscal year of 2024, Argo received $231,742 in total compensation.

25.    Defendant Edgar R. Giesinger ("Giesinger") has been a member of the Board since May 2017. Defendant Giesinger is the Chair of the Audit Committee and is a member of the Nominating and Governance Committee. For the fiscal year of 2024, Giesinger received $251,742 in total compensation.

26.    Defendant W. Howard Keenan Jr. ("Keenan") has been a member of the Board since May 2017. For the fiscal year of 2024, Keenan received $211,087 in total compensation.

27.    Defendant A. James Teague ("Teague") has been a member of the Board since May 2017. Defendant Teague is a member of the Compensation Committee. For the fiscal year of 2024, Teague received $216,310 in total compensation.

28.    Defendant Ray N. Walker Jr. ("Walker") has been a member of the Board since August 2018. Defendant Walker is the Chair of the Compensation Committee. For the fiscal year of 2024, Walker received $216,310 in total compensation.

29.    Defendant M. Max Yzaguirre ("Yzaguirre") has been a member of the Board since January 2025. Defendant Yzaguirre is a member of the Audit Committee.

30.    Defendants Zartler, Brock, Burke, Argo, Durrett, Giesinger, Keenan, Teague, Walker, and Yzaguirre are collectively referred to herein as the "Director Defendants."

31.    The Director Defendants along with the Securities Action Defendants are referred to collectively herein as the "Individual Defendants."

32.    The Individual Defendants along with Solaris are known collectively as the "Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

33.    By reason of their positions as officers, directors, and/or fiduciaries of Solaris, and because of their ability to control the business and corporate affairs of Solaris, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Solaris in a fair, just, honest, and equitable manner. The Individual Defendants were,

and are, required to act in furtherance of the best interests of Solaris and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

34.     Each director and officer of the Company owes to Solaris and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

35.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

### Duties of the Members of the Audit Committee

36.     Pursuant to the Audit Committee Charter of Solaris (adopted as of May 11, 2017)[3], the purpose of the Audit Committee is as follows:

A.     Assist the Board in fulfilling its oversight responsibilities regarding the:

- Integrity of the Company's financial statements;

- Company's compliance with legal and regulatory requirements;

- Qualifications, independence and performance of the independent registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company (the "independent registered public accounting firm"); and

- Effectiveness and performance of the Company's internal audit function;

---

[3]  Available at https://ir.solaris-energy.com/~/media/Files/S/Solaris-IR/documents/governance-documents/Solaris-Audit-Committee-Charter-0517.pdf.

B.    Annually, prepare an Audit Committee Report and publish the report in the Company's proxy statement for its annual meetings of stockholders, in accordance with applicable rules and regulations; and

C.    Perform such other functions as the Board may assign to the Committee from time to time.

37.    Concerning the Audit Committee's Authority, the Audit Committee Charter states:

**A.    *Authority***

The Committee has the authority to:

1.    Conduct or authorize investigations into any matter, including, but not limited to, complaints relating to accounting, internal accounting controls or auditing matters, within the scope of the responsibilities delegated to the Committee as it deems appropriate, including the authority to request any officer, employee or advisor of the Company to meet with the Committee or any advisors engaged by the Committee

38.    Concerning Audit Committee's Responsibilities, the Audit Committee Charter states:

**B.    *Responsibilities***

The Committee's responsibilities are limited to oversight. Although the Committee has the responsibilities set forth in this Charter, it is not the responsibility of the Committee to plan or conduct audits or to determine that the Company's financial statements and disclosures are complete and accurate and are in accordance with generally accepted accounting principles ("GAAP") and applicable laws, rules and regulations. These are the responsibilities of management, the internal auditor and the independent registered public accounting firm.

*Interaction with the Independent Registered Public Accounting Firm*

1.    *Appointment and Oversight.* The Committee is directly responsible for the appointment, compensation, retention and oversight of the work of the independent registered public accounting firm hired for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company. The Committee and the independent registered accounting firm will discuss the firm's responsibilities and the responsibilities of management in the audit process. The independent registered public accounting firm will report directly to the Committee and the Committee will routinely review such firm's performance. In addition, the Committee will

oversee the resolution of any disagreements between the Company's management and the independent registered public accounting firm regarding financial reporting.

2. *Pre-Approval of Services*. Before the independent registered public accounting firm is engaged by the Company or its subsidiaries to render audit or non-audit services, the Committee must pre-approve the engagement. Committee pre-approval of audit and non-audit services is not required if the engagement for the services is entered into pursuant to pre-approval policies and procedures established by the Committee. The Chairman of the Committee has the authority to grant pre-approvals, provided such approvals are within the pre-approval policy and presented to the Committee at a subsequent meeting.

3. *Independence of Registered Public Accounting Firm*. The Committee will, at least annually, review the independence and quality control procedures of the independent registered public accounting firm and the experience and qualifications of the independent registered public accounting firm's senior personnel that are providing audit services to the Company. In conducting its review, the Committee will:

   a) Obtain and review a report prepared by the independent registered public accounting firm describing (i) the firm's internal quality control procedures and (ii) any material issues raised by the most recent internal quality-control review, or peer review, of the firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, involving one or more independent audits carried out by the firm, and any steps taken to address and respond to any such issues.

   b) Discuss with representatives of the independent registered public accounting firm its independence from the Company, and obtain and review a written statement prepared by the independent registered public accounting firm describing all relationships between the independent registered public accounting firm and the Company, consistent with applicable requirements of the Public Company Accounting Oversight Board regarding the independent accountant's communications with the Committee concerning independence, and consider the impact that any relationships or services may have on the objectivity and independence of the independent registered public accounting firm.

   c) If applicable, consider whether the provision by the independent registered public accounting firm of any permitted information technology services or other non-audit services to the Company is compatible with maintaining the independence of the independent registered public accounting firm.

d)  Confirm with the independent registered public accounting firm that the firm is in compliance with the partner rotation requirements established by the SEC.

e)  Consider whether, in order to assure continuing independence of the independent registered public accounting firm, it is appropriate to adopt a policy of rotating the independent registered public accounting firm on a regular basis.

f)  Review and evaluate the lead partner of the independent registered public accounting firm.

_Annual Financial Statements and Annual Audit_

1. _Meetings with Management, the Independent Registered Public Accounting Firm and the Internal Auditor_. The Committee will:

    a)  Meet with management, the independent registered public accounting firm and the internal auditor in connection with each annual audit to discuss the scope of the audit, the procedures to be followed and the staffing of the audit.

    b)  Review and discuss with management and the independent registered public accounting firm: (i) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; (ii) any analyses prepared by management or the independent registered public accounting firm setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including analyses of the effects of alternative treatments of financial information within GAAP on the Company's financial statements; and (iii) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements.

    c)  Review and discuss the annual audited financial statements with management and the independent registered public accounting firm, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

2. *Separate Meetings with the Independent Registered Public Accounting Firm.* The Committee will:

    a)    Review with the independent registered public accounting firm any problems or difficulties the independent registered public accounting firm may have encountered during the course of the audit work, including any restrictions on the scope of activities or access to required information or any significant disagreements with management and management's responses to such matters. Among the items that the Committee should consider reviewing with the independent registered public accounting firm are: (i) any accounting adjustments that were noted or proposed by the independent registered public accounting firm but were "passed" (as immaterial or otherwise); (ii) any communications between the audit team and the independent registered public accounting firm's 6 national office respecting auditing or accounting issues presented by the engagement; and (iii) any "management" or "internal control" letter issued, or proposed to be issued, by the independent registered public accounting firm to the Company. The Committee will obtain from the independent registered public accounting firm assurances that Section 10A(b) of the Securities Exchange Act of 1934, as amended, has not been implicated. The review should also include discussion of the responsibilities, budget and staffing of the Company's internal audit function.

    b)    Discuss with the independent registered public accounting firm the report that such firm is required to make to the Committee regarding: (i) all accounting policies and practices to be used that the independent registered public accounting firm identifies as critical; (ii) all alternative treatments of financial information within GAAP for policies and practices related to material items that have been discussed among management and the independent registered public accounting firm, including the ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent registered public accounting firm; and (iii) all other material written communications between the independent registered public accounting firm and management of the Company, such as any management letter, management representation letter, reports on observations and recommendations on internal control over financial reporting, the independent registered public accounting firm's engagement letter, the independent registered public accounting firm's independence letter, schedule of unadjusted audit differences and a listing of adjustments and classifications not recorded, if any.

c)  Discuss with the independent registered public accounting firm the matters required to be discussed by Auditing Standard No. 16 as then in effect.

3.  *Recommendation to Include Financial Statements in Annual Report*. The Committee will, based on the review and discussions in paragraphs 1(c) and 2(c) of this "Annual Financial Statements and Annual Audit" Section, and based on the disclosures received from the independent registered public accounting firm regarding its independence and discussions with representatives of the firm regarding such independence pursuant to subparagraph 3(b) of the "Interaction with the Independent Registered Public Accounting Firm" Section, determine whether to recommend to the Board that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year subject to the audit.

## Quarterly Financial Statements

1.  *Meetings with Management and the Independent Registered Public Accounting Firm*. The Committee will review and discuss the quarterly financial statements with management and the independent registered public accounting firm, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

## Internal Audit

1.  *Appointment and Removal*. Each year, the Committee will review and advise the Board on the selection and removal of the internal audit director.

2.  *Performance*. Each year, the Committee will review the activities and structure of the internal audit function.

3.  *Separate Meetings with the Internal Auditor*. The Committee will periodically meet separately with the Company's internal auditor to discuss the responsibilities, budget and staffing of the Company's internal audit function and any issues that the internal auditor believes warrant the Committee's attention. In addition, the Committee will discuss with the internal auditor any significant reports to management prepared by the internal auditor and any responses from management.

## Other Powers and Responsibilities

1.  The Committee will review with management and the independent registered public accounting firm the Company's earnings press releases (paying particular attention to any use of "pro forma" or "adjusted" non-GAAP information), as well as financial information and earnings guidance provided to analysts and rating agencies. Such discussions may be in general terms (i.e.,

discussion of the types of information to be disclosed and the types of presentations to be made).

2. The Committee will review, approve or ratify related party transactions as set forth in the Company's Related Persons Transactions Policy.

3. The Committee will discuss with management and the independent registered public accounting firm any correspondence from or with regulators or governmental agencies, any employee complaints or any published reports that raise material issues regarding the Company's financial statements, financial reporting process, accounting policies or internal audit function.

4. The Committee will discuss with the Company's Chief Administrative Officer or General Counsel, as applicable, or outside counsel any legal matters brought to the Committee's attention that could reasonably be expected to have a material impact on the Company's financial statements.

5. The Committee will meet separately with management on a periodic basis to discuss matters related to the Company's internal control over financial reporting and other matters related to the Company's internal audit function.

6. Once required, the Committee will review and discuss with management and the independent registered public accounting firm the Company's report on internal control over financial reporting prior to filing the Company's Annual Report on Form 10-K.

7. The Committee will discuss with management the Company's guidelines and policies with respect to risk assessment and risk management. In addition, the Committee will discuss with management the Company's significant financial risk exposures and the actions management has taken to monitor and control such exposures.

8. The Committee will set clear hiring policies for employees or former employees of the Company's independent registered public accounting firm.

9. The Committee will establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters. The Committee will also establish procedures for the confidential and anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

10. The Committee will establish procedures for the receipt, retention and treatment of complaints received by the Company regarding potential violations of applicable laws, rules and regulations or of the Company's codes, policies and procedures. The Committee will also establish procedures for the confidential

and anonymous submission by employees of the Company of concerns regarding questionable compliance matters.

11. The Committee will prepare for inclusion in the Company's proxy statement for its annual meeting of stockholders the report required by the rules of the Securities and Exchange Commission.

12. The Committee will review with the Company's Chief Administrative Officer or General Counsel, as applicable, the Company's Corporate Code of Business Conduct and Ethics and its enforcement at least annually.

13. The Committee will review with the Company's Chief Administrative Officer or General Counsel, as applicable, the Company's Financial Code of Ethics and its enforcement at least annually.

14. The Committee will review the adequacy and succession planning of the Company's accounting and financial personnel at least annually.

15. The Committee will review disclosures by the Company's Chief Executive Officer and Chief Financial Officer during their certification process for the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein.

39.     Upon information and belief, the Company maintained versions of the Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

**Duties Pursuant to the Company's Code of Conduct**

40.     The Individual Defendants, as officers and/or directors of Solaris, were also bound by the Company's Corporate Code of Business Conduct and Ethics (the "Code")[4] which, according to the Code, sets out basic principles to guide all directors, officers, and employees of Solaris, who

---

[4] Available at https://ir.solaris-energy.com/~/media/Files/S/Solaris-IR/documents/governance-documents/Solaris-Corporate-Code-of-Business-Conduct-and-Ethics-0517.pdf.

are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.

41.     Concerning the responsibilities imposed by the Code, the Code states the following:

**A.  Basic Standards**

Solaris' fundamental policy is to conduct its business with honesty and integrity in accordance with the highest legal and ethical standards. Solaris and its directors, officers and employees must comply with all applicable legal requirements of the United States and each other country in which Solaris conducts business.

*     *     *

**B. Individual Responsibility and Compliance**

This Code provides guidance for specific situations that may arise. However, each director, officer, and employee has the responsibility to exercise good judgment to act in a manner that will reflect favorably upon Solaris and the individual.

Directors, officers and employees must comply with the spirit as well as the letter of this Code. Directors, officers and employees must not attempt to achieve indirectly, through the use of agents or other intermediaries, what is prohibited directly by this Code.

42.     Concerning Record Keeping, the Code states:

**A.  Solaris Books and Records**

1.     <u>Books and Records</u>. Solaris requires honest and accurate recording and reporting of information in order to make responsible business decisions. As such, Solaris' books, records and accounts must accurately and fairly reflect Solaris' transactions in reasonable detail and in accordance with Solaris' accounting practices and policies. The following examples are given for purposes of illustration and are not intended to limit the generality of the foregoing in any way:

- No false or deliberately inaccurate entries (such as overbilling or advance billing) are permitted. Discounts, rebates, credits and allowances do not constitute overbilling when lawfully granted. The reasons for the grant should generally be set forth in Solaris' records, including the party requesting the treatment.

- No payment shall be made with the intention or understanding that all or any part of it is to be used for any person other than that described by the documents supporting the payment.

- No undisclosed, unrecorded or "off-book" funds or assets are permitted.

- No false or misleading statements, written or oral, shall be intentionally made to any internal accountant or auditor or Solaris' independent registered public accounting firm with respect to Solaris' financial statements or documents to be filed with the Securities and Exchange Commission (the "SEC") or other governmental authority.

2.   <u>Internal Accounting Controls</u>. The principal executive officer and principal financial officer of the Company and each of its subsidiaries and affiliates are responsible for implementing and maintaining a system of internal accounting controls sufficient to provide reasonable assurances that:

- Transactions are executed in accordance with management's general or specific authorization;

- Transactions are recorded as necessary to: (a) permit the preparation of financial statements in conformity with generally accepted accounting principles or any other applicable criteria and (b) maintain accountability for assets;

- Access to assets is permitted only in accordance with management's general or specific authorization; and

- The recorded accountability of assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

3.   <u>Employee Conduct</u>. No director, officer or other employee of Solaris is permitted to willfully, directly or indirectly:

- Falsify, or cause to be falsified, any book, record or account of Solaris;

- Make, or cause to be made, any materially false or misleading statement or omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which the statements were made, not misleading to an accountant in connection with (a) any audit or

examination of Solaris' financial statements or (b) the preparation or filing of any document or report required to be filed by Solaris with the SEC or other governmental agency; or

- Take any action to fraudulently influence, coerce, manipulate or mislead Solaris' independent registered public accounting firm.

Directors, officers and employees must exercise reasonable due diligence in order to avoid the events described above. If an employee believes that Solaris' books and records are not being maintained in accordance with these requirements, the employee should contact his or her supervisor, a member of Human Resources Management, or the Company's Chief Administrative Officer or General Counsel, as appropriate.

43.     Concerning Business and Trade Practices, the Code states:

**A.     Compliance with Laws, Rules and Regulations**

1.     <u>Compliance with Laws</u>. Obeying the law, both in letter and in spirit, is the foundation upon which Solaris' ethical standards are built. All directors, officers and employees must respect and obey the laws of the cities, states and countries in which Solaris operates. Although directors, officers and employees are not expected to know every law that is applicable to Solaris, it is important that directors, officers and employees know enough to ask questions and seek advice from supervisors, managers, lawyers or other appropriate personnel if they have any doubt regarding the legality of an action taken, or not taken, on behalf of Solaris.

2.     <u>Insider Trading</u>. Purchasing or selling, whether directly or indirectly, the Company's securities while in possession of material non-public information is both unethical and illegal. Directors, officers and employees also are prohibited by law from disclosing material non-public information to others who might use the information to directly or indirectly place trades in the Company's securities. Directors, officers and employees also shall not recommend the purchase or sale of the Company's securities. All directors, officers and employees shall comply with the Company's Insider Trading Policy.

3.     <u>Section 16 Reporting</u>. Pursuant to Section 16 of the Securities Exchange Act of 1934, as amended, most purchases or sales of the Company's securities by directors, executive officers and 10% stockholders must be disclosed within two business days of the transaction. Directors, officers and employees who are subject to

these reporting requirements must comply with the Company's Short-Swing Trading and Reporting Policy.

**B.    Fair Dealing**

Directors, officers and employees should endeavor to deal fairly with Solaris' vendors, suppliers, contractors, competitors and employees. No director, officer or other employee should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other practice involving unfair dealing.

**C.    Non-disclosure of Confidential Information**

The protection of confidential information of Solaris and confidential information of its vendors, service providers, and other third parties who have provided such information to Solaris with an expectation of confidentiality, is vital to the best interests of Solaris. Directors, officers, and employees of Solaris may be provided with confidential information or may have access to confidential information. Such confidential information includes, but is not limited to:

- technical information of Solaris or third parties, such as computer programs, software, databases, methods, know-how, formulae, compositions, technological data, technological prototypes, processes, discoveries, machines, inventions, and similar items;

- business information of Solaris or third parties, such as but not limited to strategic goals and plans, pricing information, compensation data, financial information, credit information, and similar items; and

- information relating to future plans of Solaris or third parties, such as but not limited to marketing strategies, new materials research, pending projects and proposals, proprietary production processes, research and development strategies, and similar items.

44.    Concerning Disclosure Controls, the Code states:

**B.  Disclosure Controls**

It is the Company's policy to promote full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the SEC and in other public communications made by the Company.

45.    Concerning Reporting Violations, the Code states:

20

Solaris encourages and promotes ethical behavior.

Directors, officers and employees should report violations of applicable laws, rules and regulations (including, without limitation, the listing requirements of the New York Stock Exchange ("NYSE")), this Code or any other code, policy or procedure of Solaris to the individual's supervisor, a member of Human Resources Management, or the Company's Chief Administrative Officer or General Counsel, as appropriate.

Directors, officers and employees are expected to cooperate in internal investigations of misconduct.

46.     Upon information and belief, the Company maintained versions of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

### Control, Access, and Authority

47.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Solaris, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Solaris.

48.     Because of their advisory, executive, managerial, and directorial positions with Solaris, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Solaris.

49.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Solaris and was at all times acting within the course and scope of such agency.

### Reasonable and Prudent Supervision

50.     To discharge their duties, the officers and directors of Solaris were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls

of the financial affairs of the Company. By virtue of such duties, the officers and directors of Solaris were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d) remain informed as to how Solaris conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that Solaris was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

51.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to Solaris and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Solaris, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors

and officers of Solaris, the absence of good faith on their part, and a reckless disregard for their duties to Solaris and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Solaris.

52.    The Individual Defendants each breached their duties of loyalty and good faith by allowing the Individual Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

53.    In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Related Securities Action that alleges violations of the federal securities laws. As a result, Solaris has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

54.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

55.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

56.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the

Individual Defendants' violations of law, including breaches of fiduciary duties, unjust enrichment, gross mismanagement, and abuse of control; and (b) disguise and misrepresent the Company's actual business and financial prospects.

57.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

58.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

59.     Solaris, based in Houston, Texas, is an energy infrastructure company that supplies equipment used in the completion of oil and natural gas wells within the United States. Solaris was previously known as Solaris Oilfield Infrastructure, Inc. ("Solaris Oilfield Infrastructure"), but changed its name to Solaris Energy Infrastructure, Inc. in September 2024 after the acquisition of MER.

60.     Following the Company's name change and acquisition of MER, Solaris divided into two segments: (i) Solaris Power Solutions, and (ii) Solaris Logistics Solutions. The

Company's Solaris Power Solutions segment offers commercial and industrial clients with configurable mobile turbines and other ancillary equipment, and is the post-acquisition rebrand of MER's business. The Company's Solaris Logistics Solutions segment designs and manufactures specialized equipment, as well as field technician support, software solutions, and logistics services, amongst other services, and is the post-acquisition rebrand of Solaris Oilfield Infrastructure's business.

61.    For five consecutive quarters leading up to the acquisition of MER, Solaris experienced declining revenues. The Company attributed the decline to "continued maturation" of its logistics solutions business.

## Defendants' False and Misleading Statements

62.    On July 9, 2024, the Company issued the July 9 Press Release titled "Solaris Announced Agreement to Acquire Mobile Energy Rentals; Announced Remaining to Solaris Energy Infrastructure; Issues Second Quarter Financial Updates," in which the MER acquisition was announced. The July 9 Press Release touted the value proposition of MER, stating that MER was equipped with an "***Experienced and aligned management team,***" with a "***long and successful track-record of managing power solutions***" which served a "***diverse set of end-market and customers.***" Specifically, the July 9 Press Release stated, in relevant part:

**Transaction Highlights and Strategy**

• **Scale, end-market diversity, and contractual profile:** Entry into critical distributed power infrastructure solutions provides access to multiple, high-growth end-markets; pro forma business mix expected to be >50% distributed power infrastructure, supported by a robust contract profile and a diverse set of end-markets and customers

• **Compelling valuation:** Initial purchase multiple of 4.0x run-rate contracted Adjusted EBITDA*; MER's third quarter 2024 Adjusted EBITDA is forecasted to be approximately $12 million - $13 million, representing annualized run-rate Adjusted EBITDA of approximately $50 million; majority of MER's asset base

25

currently under contract with a leading provider of artificial intelligence computing solutions

• **Attractive capital redeployment opportunity:** MER's existing power generation asset base of 153 MW is currently fully-utilized; the fleet is expected to grow to 478 MW by the end of the third quarter of 2025** through the purchase of additional mobile turbines for approximately $308 million and is expected to be deployed at similar return profiles across a diverse customer base

• **Experienced and aligned management team:** MER's founders and management team will be fully-integrated into Solaris post-closing, leveraging their long and successful track-record of managing power solutions across a range of end-markets; following the closing of the transaction, MER's founders and management will own, in aggregate, approximately 27% of Solaris' outstanding shares

• **Synergies with our business**: Operational synergies are available to the combined platform via Solaris' engineering, manufacturing, field service, commercial and corporate infrastructure

• **Committed to growing shareholder value:** Conservative pro forma financial profile, with <2.0x leverage* at closing on a run-rate basis with further deleveraging as new power generation equipment is placed into service; committed to maintaining the current $0.48/share annualized dividend, which has been paid for 23 consecutive quarters

• **Aligned ownership:** After the closing of the transaction, management, insiders and MER's founders and management team will collectively own >50% of Solaris' total outstanding shares, creating further alignment between Solaris and its shareholders

Founded in 2022 and based in Houston, Texas, MER provides configurable sets of primarily natural-gas powered mobile turbines and ancillary equipment to energy, data center and other C&I end-markets. MER's solutions provide reliable and cost-effective power where grid infrastructure may not be available or is unreliable.

\*      \*      \*

**Q2 2024 Financial Update**

As of the date of this news release, Solaris has not finalized its financial results for the second quarter of 2024. However, based on preliminary information, Solaris expects second quarter revenue to be between $70 million and $75 million and Adjusted EBITDA to be between $20 million and $21 million for the second quarter of 2024. During the second quarter, Solaris repaid $14 million of debt, ending the quarter with $11 million of net debt.

26

63.     On the same day, the Company published an investor presentation further detailing the MER acquisition (the "July 9 Investor Presentation"). The July 9 Investor Presentation continued to represent that MER was a "premier provider of distributed power solutions" and a "compelling value creation opportunity" for the Company. The July 9 Investor Presentation included the following:



*     *     *



64.     On November 4, 2024, the Company issued a press release announcing its financial results for the third quarter of 2024 (the "3Q 2024 Earnings Press Release"). The 3Q 2024 Earnings Press Release highlighted Solaris' financial results as well as provided investors with an update regarding the MER acquisition. The 3Q 2024 Earnings Press Release revealed that the MER acquisition was completed on September 11, 2024, and MER was rebranded as the Company's Power Solutions segment. The 3Q 2024 Earnings Press Release stated, in relevant part:

**Third Quarter 2024 Summary Results and Recent Highlights**

• Revenue of $75 million

• Net loss of $2 million and ($0.04) per diluted Class A share; Adjusted pro forma net income(1) of $4 million and $0.08 per fully diluted share

• Adjusted EBITDA(1) of $22 million

• On September 11, 2024, closed the acquisition of Mobile Energy Rentals LLC ("MER," and such acquisition, the "MER Acquisition"), a premier provider of distributed power solutions; established new Solaris Power Solutions segment

• Closed $325 million senior secured term loan to effectuate the MER Acquisition and to support continued growth capital investment into the Solaris Power Solutions fleet

• Executed additional power service agreements with customers, totaling approximately 450 megawatts ("MW") of generation capacity, or greater than 80% of expected 2025 ending capacity (including all deliveries on order); contract tenor ranges from two to four years, providing the Company significant earnings visibility

• Returned a total of $5 million to shareholders in third quarter 2024 through dividends, resulting in $183 million cumulatively returned to shareholders since 2018

• Approved fourth quarter 2024 dividend of $0.12 per share on October 30, 2024, to be paid on December 16, 2024, to holders of record as of December 6, 2024 which, once paid, will represent Solaris' 25th consecutive dividend

"During the quarter, Solaris both announced and closed on a transformative acquisition, while continuing to deliver strong service quality for our customers across both business segments," Chairman and Chief Executive Officer Bill Zartler commented

"The commercial opportunity set for our Power Solutions segment is accelerating rapidly, further highlighting the demand for 'behind-the-meter' power generation applications across a variety of end markets. We are pleased to announce that since closing the acquisition we have signed several power service contracts at tenors ranging from two to four years, bringing our customer agreements to over 80% of our expected ending 2025 capacity. This is a testament to both the strong team we have in place, as well as the broad-based growth in electrification and artificial intelligence computing applications.

"Our Solaris Logistics Solutions segment continues to focus on technology advancements that drive efficiency gains and add value for our customers, which is evident in our leading market position within the Logistics Solutions segment and the continued adoption of our new technologies. We remain committed to the provision of exceptional service quality by leveraging our company culture and innovative technologies across both of our business segments. Together, the combined business provides a balanced and attractive financial profile that is also uniquely positioned to grow and drive total shareholder value."

65.    On November 7, 2024, the Company filed its Form 10-Q with the SEC for the third quarter of 2024 (the "3Q 2024 Form 10-Q"), signed by Defendants Zartler and Ramachandran.

Attached to the 3Q 2024 Form 10-Q were certifications by Defendants Zartler and Ramachandran made pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") certifying that the 3Q 2024 Form 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the [3Q 2024 Form 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

66.    The 3Q 2024 Form 10-Q revealed that Solaris had paid $60 million in cash consideration, approximately 16.5 million in Solaris shares, and $71 million to repay MER's debt in connection with the acquisition. The 3Q 2024 Form 10-Q further revealed that the acquisition's fair value of total purchase consideration was $323.1 million, consisting of $186.4 million associated with the issuance of approximately 16.5 million shares of Solaris common stock, $77.1 million associated with cash paid for capital expenditures reimbursement, $44.9 million in initial cash consideration, and $14.7 million paid for MER's closing cash balance. The 3Q 2024 Form 10-Q additionally stated that the Company held $306.395 million in net property, plant and equipment property, and $939.487 million in total assets. Further, the 3Q 2024 Form 10-Q stated that the assumed useful life of the Company's turbine equipment held for lease was "25 years." Additionally, 3Q 2024 Form 10-Q continued to tout MER's value proposition, stating in relevant part:

| | September 30, 2024 | December 31, 2023 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 18,634 | $ 5,833 |
| Restricted cash | 97,907 | — |
| Accounts receivable, net of allowances for credit losses of $681 and $104, respectively | 50,321 | 44,916 |
| Accounts receivable - related party | 6,444 | 2,378 |
| Other receivables | 6,502 | — |
| Prepaid expenses and other current assets | 6,059 | 4,342 |
| Inventories | 11,165 | 6,672 |
| Assets held for sale | — | 3,000 |
| Total current assets | 197,032 | 67,141 |
| Property, plant and equipment, net | 306,395 | 325,121 |
| Equipment held for lease, net | 212,664 | — |
| Non-current inventories | 1,635 | 1,593 |
| Non-current receivables, net of allowances of $654 and $862, respectively | 1,069 | 1,663 |
| Operating lease right-of-use assets | 10,087 | 10,721 |
| Goodwill | 101,007 | 13,004 |
| Intangible assets, net | 73,698 | 702 |
| Deferred tax assets | 34,504 | 48,010 |
| Other assets | 1,396 | 342 |
| Total assets | $ 939,487 | $ 468,297 |

\*     \*     \*

Solaris Power Solutions, recently established following the acquisition of Mobile Energy Rentals LLC ("MER"), provides mobile power generation solutions through equipment lease arrangements. On September 11, 2024, Solaris, through its subsidiary Solaris Energy Infrastructure, LLC ("Solaris LLC"), completed the acquisition of MER. ***MER operates throughout the United States, providing configurable sets of primarily natural gas-powered mobile turbines and ancillary equipment to energy, data center, and other commercial and industrial end-markets. This acquisition provided Solaris entry into the large and growing distributed power solutions market, both enhancing our position as a mobile equipment and logistics solution provider to the oil and gas industry and also diversifying our end market exposure.***

\*     \*     \*

On September 11, 2024, we completed the acquisition of 100% of the outstanding equity interests in MER, in accordance with the contribution agreement dated July 9, 2024 (the "MER Acquisition"). ***The integration of our legacy business with MER's operations is expected to enhance our capabilities in providing mobile, configurable equipment solutions and logistics services to our customers across various industries.***

The MER Acquisition was accounted for using the acquisition method of accounting for business combinations. ***The fair value of the total purchase consideration transferred was $323.1 million***, consisting of the following amounts:

| | | Amount |
|---|---|---|
| Issuance of 16,464,778 Solaris LLC units and an equal number of Class B Common Stock (the "equity consideration") | $ | 186.4 |
| Cash Paid for Capital Expenditures Reimbursement | | 77.1 |
| Initial Cash Consideration (net of initial working capital adjustments) | | 44.9 |
| Cash Paid for MER's Closing Cash Balance | | 14.7 |
| Fair Value of Total Purchase Consideration Transferred | $ | 323.1 |

*     *     *

The table below outlines our preliminary allocation of the ***total purchase consideration to the identifiable assets*** acquired and liabilities assumed, based on their fair values at the acquisition closing date.

| | | Amount |
|---|---|---|
| Cash | $ | 14.7 |
| Accounts receivable | | 7.5 |
| Inventories | | 2.5 |
| Prepaid expenses and other current assets | | 0.1 |
| Property and equipment and equipment held for lease | | 158.7 |
| Operating lease right-of-use assets | | 0.4 |
| Intangible assets - customer relationships (1) | | 65.9 |
| Intangible assets - trademarks (2) | | 8.0 |
|     Total assets acquired | $ | 257.8 |
| | | |
| Accounts payable | $ | 5.0 |
| Accrued liabilities | | 0.7 |
| Deferred revenue | | 11.9 |
| Operating lease liabilities | | 0.4 |
| Finance lease liabilities | | 0.2 |
| Deferred tax liabilities | | 4.5 |
|     Total liabilities assumed | $ | 22.7 |
| | | |
| Net assets acquired | | 235.1 |
| | | |
| Goodwill | $ | 88.0 |

    (1)  Customer relationships are being amortized over a 10-year life.
    (2)  Trademarks are being amortized over a 5-year life.

***The fair value of the acquired property and equipment and equipment held for lease was determined using both cost and market approaches***. The cost approach was primarily employed, which involved estimating the replacement cost of the assets and adjusting this amount for their age, condition and utility. The market approach was also considered, analyzing recent transactions of comparable property and equipment to establish a fair market value. ***The valuation methods used to determine the estimated fair value of identifiable intangible assets included the multi-period excess earnings method for customer relationships and the relief from royalty method for trademark***s. Several significant assumptions were involved in the application of these valuation methods, including forecasted sales volumes and prices, royalty rates, contributory asset charges, discount rates

and estimated useful lives of the intangible assets. These identifiable intangible assets have finite lives and are subject to amortization over their estimated useful lives.

***The value assigned to goodwill in connection with the business combination is $88.0 million. This goodwill has been allocated to our Solaris Power Solutions segment and represents the excess of the purchase price over the fair value of identifiable net assets acquired, reflecting the assembled workforce and expected growth opportunities available to us resulting from the MER Acquisition.*** The amount of goodwill deductible for tax purposes is $18.5 million. Additionally, goodwill was increased by the deferred tax liability associated with the fair market value exceeding the tax basis of the acquired assets. Goodwill is not subject to amortization but is tested for impairment annually, or more frequently if indicators of impairment arise.

\*     \*     \*

| | September 30, 2024 | | December 31, 2023 | |
|---|---|---|---|---|
| Segment assets: | | | | |
| Solaris Logistics Solutions | $ | 381.6 | $ | 401.1 |
| Solaris Power Solutions | | 392.3 | | — |
| Total segment assets | $ | 773.9 | $ | 401.1 |
| Corporate assets | | 165.6 | | 67.2 |
| Consolidated assets | $ | 939.5 | $ | 468.3 |

\*     \*     \*

## (f) Property, plant and equipment and equipment held for lease

Property, plant and equipment and equipment held for sale are stated at cost or fair value for assets acquired in a business combination, less accumulated depreciation. Depreciation is primarily calculated using the straight-line method over the estimated useful lives of the assets. Certain assets classified under Power Generation – Ancillary Equipment are depreciated using the units of production method.

| | Useful Life |
|---|---|
| **Equipment held for lease** | |
| Power Generation - Turbine | 25 years |
| Power Generation - Ancillary Equipment | 3 - 20 years |
| | |
| **Property, plant and equipment** | |
| Oil and gas logistics equipment | Up to 15 years |
| Machinery and equipment | 3 - 12 years |
| Furniture and fixtures | 5 years |
| Computer hardware and software | 3 - 10 years |
| Vehicles | 5 years |
| Buildings and leasehold improvements | 15 years |

33

Expenses for maintenance and repairs are charged to operations as incurred, while betterments that increase the value or significantly extend the life of the related assets are capitalized.

Property, plant and equipment and equipment held for lease are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. Recoverability is assessed by comparing the carrying amount of the asset to its estimated undiscounted future cash flows. If the carrying amount exceeds the estimated future cash flows, an impairment charge is recognized for the amount by which the carrying amount exceeds the asset's fair value.

67.    On February 20, 2025, the Company issued a press release announcing its fourth quarter and full-year 2024 financial results (the "FY 2024 Earnings Press Release"). The FY 2024 Earnings Press Release continued to highlight the performance and value proposition of Solaris Power Solutions, stating in relevant part:

**Fourth Quarter 2024 Summary Results and Key Business Updates**

• **Revenue** – Revenue of $96 million increased 28% sequentially from the third quarter 2024 due to a full quarter of contribution from Solaris Power Solutions following the closing of the acquisition of Mobile Energy Rentals LLC ("MER," and such acquisition, the "MER Acquisition") on September 11, 2024, as well as continued activity growth within Solaris Power Solutions.

• **Profitability**

o Net income of $14 million and $0.19 per diluted Class A share; Adjusted pro forma net income(1) of $7 million and $0.12 per fully diluted share

o Total Adjusted EBITDA(1) of $37 million

• **Cash Flow and Capital Expenditures** – Net cash from operating activities was $13 million in the fourth quarter 2024, and capital expenditures were approximately $127 million, which primarily consisted of progress and delivery payments for power equipment. Net cash used in investing activities was approximately $115 million.

• **Balance Sheet and Liquidity** – As of December 31, 2024, Solaris had $325 million in outstanding borrowings and $160 million in total cash, of which $46 million was restricted for certain growth capital expenditures. The yearend cash balance reflected the impact from the net proceeds of approximately $156 million

from an underwritten public offering of 6.5 million shares of Class A common stock on December 11, 2024.

• **Power Solutions Growth Update** – Recently secured an additional 700 megawatts ("MW") of gas-powered turbines with majority of deliveries expected to occur throughout 2026, bringing Solaris' pro forma operated power fleet to approximately 1,400 MW by the first half of 2027. Total expected capital expenditures, including allowance for balance-of-plant and emissions control technology, associated with these orders(4) are estimated to be approximately $600 million.

68.    On March 5, 2025, the Company filed its annual report on Form 10-K for the 2024 fiscal year with the SEC (the "2024 Form 10-K"), signed by Defendants Zartler, Ramachandran, Argo, Burke, Durrett, Giesinger, Keenan, Teague, and Walker. Attached to the 2024 Form 10-K were SOX certifications signed by Defendants Zartler and Ramachandran certifying that the 2024 Form 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that the "information contained in the [2024 Form 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

69.    The 2024 Form 10-K represented that the Company held $298.828 million in net property, plant, and equipment and $1.123 billion in total assets.

70.    The 2024 Form 10-K repeated the same false and misleading statements from the 3Q 2024 Form 10-Q referenced herein above regarding the fair value of the MER acquisition.

71.    Specifically, the 2024 Form 10-K stated, in relevant part:

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 114,255 | $ 5,833 |
| Restricted cash | 45,612 | — |
| Accounts receivable, net of allowances of $681 and $104, respectively | 71,774 | 44,916 |
| Accounts receivable - related party | — | 2,378 |
| Prepaid expenses and other current assets | 8,387 | 4,342 |
| Inventories | 10,948 | 6,672 |
| Assets held for sale | — | 3,000 |
| Total current assets | 250,976 | 67,141 |
| Property, plant and equipment, net | 298,828 | 325,121 |
| Equipment held for lease, net | 339,932 | — |
| Non-current inventories | 1,693 | 1,593 |
| Non-current receivables, net of allowance of $654 and $862, respectively | 1,069 | 1,663 |
| Operating lease right-of-use assets | 9,966 | 10,721 |
| Goodwill | 103,985 | 13,004 |
| Intangible assets, net | 71,521 | 702 |
| Deferred tax assets, net | 43,574 | 48,010 |
| Other assets | 1,337 | 342 |
| Total assets | $ 1,122,881 | $ 468,297 |

\*       \*       \*

On September 11, 2024, Solaris, through its subsidiary Solaris Energy Infrastructure, LLC ("Solaris LLC"), completed the acquisition of Mobile Energy Rentals LLC ("MER"). ***MER operates throughout the United States, providing configurable sets of primarily natural gas-powered mobile turbines and ancillary equipment to energy, data center, and other commercial and industrial end-markets. This acquisition provided Solaris with an entry into the large and growing distributed power solutions market, both enhancing our position as a mobile equipment and logistics solution provider to the oil and gas industry and also diversifying our end market exposure.***

\*       \*       \*

On September 11, 2024, we completed the acquisition of 100% of the outstanding equity interests in MER, in accordance with the contribution agreement dated July 9, 2024 (the "MER Acquisition"). Since the completion of the MER Acquisition, we have made significant progress in integrating our legacy business with MER's operations, enhancing our capabilities in providing mobile, configurable equipment solutions and logistics services to our customers across various industries.

The MER Acquisition was accounted for using the acquisition method of accounting for business combinations. ***The fair value of the total purchase consideration transferred was $323.1 million, consisting of the following amounts:***

| | | Amount |
|---|---|---|
| Issuance of 16,464,778 Solaris LLC units and an equal number of Class B Common Stock (the "equity consideration") | $ | 186.4 |
| Cash Paid for Capital Expenditures Reimbursement | | 77.1 |
| Cash Consideration (net of working capital adjustments) | | 44.9 |
| Cash Paid for MER's Closing Cash Balance | | 14.7 |
| Fair Value of Total Purchase Consideration Transferred | $ | 323.1 |

\*      \*      \*

The table below outlines our preliminary allocation of the ***total purchase consideration to the identifiable assets acquired and liabilities assumed, based on their fair values at the acquisition date.***

| | | Amount |
|---|---|---|
| Cash | $ | 14.7 |
| Accounts receivable | | 7.5 |
| Inventories | | 2.5 |
| Prepaid expenses and other current assets | | 0.1 |
| Property and equipment and equipment held for lease | | 158.7 |
| Operating lease right-of-use assets | | 0.4 |
| Intangible assets - customer relationships (1) | | 65.9 |
| Intangible assets - trademarks (2) | | 8.0 |
| Total assets acquired | $ | 257.8 |
| | | |
| Accounts payable | $ | 5.0 |
| Accrued liabilities | | 0.7 |
| Deferred revenue | | 11.9 |
| Operating lease liabilities | | 0.4 |
| Finance lease liabilities | | 0.2 |
| Deferred tax liabilities (3) | | 7.5 |
| Total liabilities assumed | $ | 25.7 |
| | | |
| Net assets acquired | | 232.1 |
| | | |
| Goodwill | $ | 91.0 |

(1) Customer relationships are being amortized over a weighted average period of 9.3 years.
(2) Trademarks are being amortized over a weighted average period of 5 years.
(3) In the fourth quarter of 2024, a measurement period adjustment was made to increase deferred tax liabilities by $3.0 million related to the acquired long-lived tangible assets, with a corresponding increase to goodwill.

***The fair value of the acquired property and equipment and equipment held for lease was determined using both cost and market approaches***. The cost approach was primarily employed, which involved estimating the replacement cost of the assets and adjusting this amount for their age, condition and utility. The market approach was also considered, analyzing recent transactions of comparable

property and equipment to establish a fair market value. ***The valuation methods used to determine the estimated fair value of identifiable intangible assets included the multi-period excess earnings method for customer relationships and the relief from royalty method for trademarks***. Several significant assumptions were involved in the application of these valuation methods, including revenue growth rate, royalty rates, contributory asset charges, probability of renewal curves, discount rates and estimated useful lives of the intangible assets. These identifiable intangible assets have finite lives and are subject to amortization over their estimated useful lives.

***The value assigned to goodwill in connection with the business combination is $91.0 million. This goodwill has been allocated to our Solaris Power Solutions segment and represents the excess of the purchase price over the fair value of identifiable net assets acquired, reflecting the assembled workforce and expected growth opportunities available to us resulting from the MER Acquisition.*** The amount of goodwill deductible for tax purposes is $13.1 million. Additionally, goodwill was increased by the deferred tax liability associated with the fair market value exceeding the tax basis of the acquired assets. Goodwill is not subject to amortization but is tested for impairment annually, or more frequently if indicators of impairment arise.

*        *        *

| | December 31, | | | |
| --- | --- | --- | --- | --- |
| | | 2024 | | 2023 |
| Segment assets: | | | | |
|    Solaris Logistics Solutions | $ | 371.7 | $ | 401.1 |
|    Solaris Power Solutions | | 535.3 | | — |
| Total segment assets (1) | $ | 907.0 | $ | 401.1 |
| Corporate assets (2) | | 215.9 | | 67.2 |
| Consolidated assets | $ | 1,122.9 | $ | 468.3 |

(1) Segment assets consist of accounts receivable, prepaid assets, inventories, goodwill and long-lived assets.

(2) Corporate assets consist of cash and cash equivalents, restricted cash, prepaid expenses, deferred tax assets and other assets.

*        *        *

**Property, Plant and Equipment and Equipment Held for Lease**

Property, plant and equipment, as well as equipment held for lease, are initially recorded at cost, except for assets acquired in a business combination, which are recorded at fair value on the acquisition date. At period-end, these assets are reported at their initial measurement (whether at cost or fair value) less accumulated depreciation. Depreciation is primarily calculated using the straight-line method over the estimated useful lives of the assets. Certain assets classified under Power Generation – Ancillary Equipment are depreciated using the units of production

method. We also capitalize interest on borrowings directly attributable to the acquisition or construction of certain capital assets. The capitalized interest is included in the cost of the asset and is subsequently depreciated over its estimated useful life.

| | Useful Life |
|---|---|
| **Equipment held for lease** | |
| Power Generation - Turbine | 25 years |
| Power Generation - Ancillary Equipment | 3 - 20 years |
| | |
| **Property, plant and equipment** | |
| Oil and gas logistics equipment | 5 - 15 years |
| Machinery and equipment | 3 - 12 years |
| Furniture and fixtures | 5 years |
| Computer hardware and software | 3 - 10 years |
| Vehicles | 5 years |
| Buildings and leasehold improvements | 15 years |

Expenses for maintenance and repairs are charged to operations as incurred, while betterments that increase the value or significantly extend the life of the related assets are capitalized. When assets are sold or disposed of, the related cost and accumulated depreciation are removed from the consolidated balance sheets, and any resulting gain or loss is recognized in the consolidated statement of operations.

Property, plant and equipment and equipment held for lease are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. Recoverability is assessed by comparing the carrying amount of the asset to its estimated undiscounted future cash flows. If the carrying amount exceeds the estimated future cash flows, an impairment charge is recognized for the amount by which the carrying amount exceeds the asset's fair value.

72. The statements detailed above were materially false and misleading because they failed to disclose, inter alia, that: (i) MER's experience and track record in the turbine leasing sector were overstated; (ii) one of MER's co-owners was embroiled in numerous controversies, including turbine-related fraud and a felony conviction for environmental crimes; (iii) MER's minimal clientele limited its value proposition to Solaris; (iv) as a result, Solaris overstated the commercial prospects of the MER acquisition; and (v) Solaris overstated its total assets and near term profitability on its financial reports due to the failure to properly depreciate MER's turbines

in accordance with industry standards. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

**The Truth is Revealed**

73.    On March 17, 2025, Morpheus Research published the Morpheus Research Report. The Morpheus Research Report revealed that despite assurances from Defendant Zartler stating that he had known MER's management team "for a long time" and that he believed "the cultural and operational fit" between the two businesses was "highly complementary," Tuma was in fact a convicted felon for lying under oath and environmental crimes. Further, at a prior company Tuma was involved in an $800 million bid rigging scandal involving gas turbines. Specifically, the Morpheus Research Report stated:

> **Solaris CEO Bill Zartler Told Shareholders That He Has Known MER's Management Team "For A Long Time" And That He Believes "The Cultural And Operational Fit" Between The Two Businesses Is "Highly Complementary"**
>
> **MER's Management Team Includes John Tuma, Who Received A 5-Year Prison Sentence In 2012 After Being Convicted Of Environmental Crimes And Lying To The Court "On Multiple Occasions Under Oath"**
>
> **Today, Tuma Owns 12% Of Solaris' Shares And Is Employed At Solaris As A "Senior Technical Advisor"**
>
> \*        \*        \*
>
> While Solaris' CEO told shareholders that he has known MER's management for a "long time," he failed to disclose that Tuma has a track record of fraud and corruption. As one industry consultant told us, Tuma has a reputation of not being a "straight shooter":
>
> No, he's not a straight shooter. His reputation is not as a straight shooter. . . . I haven't seen anything personally, let me put it that way. . . . but his reputation was enough that I didn't want to have long-term dealings with him. . . . I would be much happier if he wasn't part of [Solaris] if I was investing my own money.
>
> In March 2012, Tuma was convicted by a federal jury for discharging an estimated 200,000 gallons a day of hazardous wastewater directly into Louisiana's Red River.

According to the U.S. Department of Justice, he was sentenced to 5 years in prison, followed by a 3-year probation and a $100,000 fine:

## Shreveport, La., Wastewater General Manager and Former Owner Sentenced to Five Years in Prison for Discharging Pollutants into the Red River

(Source: DOJ)

Specifically, the indictment alleged that Tuma was directly responsible both for instructing employees to bypass environmental monitoring systems and attempting to obstruct the EPA investigation.

Moreover, the Court found (emphasis added) that Tuma "was untruthful at trial with respect to material matters in [the] case. Specifically, Mr. Tuma lied on multiple occasions under oath about intentionally discharging untreated wastewater to the City of Shreveport and the Red River." That transgression led the Court to increase the severity of Tuma sentence, according to the Court's opinion. [Pgs. 81-82] Tuma was released from prison in April 2017, according to the Federal Bureau of Prisons.

**Solaris Told Its Shareholders That MER's Management Had A "Long And Successful Track-Record Of Managing Power Solutions"**

**After His Release From Prison, Tuma Founded Life Cycle Power, Which Was At The Center Of An $800-Million Gas Turbines Scandal In Houston That Included Allegations Of Bid Rigging, Corruption, And The Inability To Deliver The Promised Number Of Turbines**

**Ross Bartley, Now Solaris' EVP Of Power Solutions, Worked Alongside Tuma As Life Cycle Power's CFO**

74.     The Morpheus Research Report additionally revealed that despite claims to investors that MER was a "premier provider of distributed power solutions serving the energy and commercial & industrial end-markets" with an "experienced and aligned management team," MER had in fact only acquired its turbines in the months leading up to the acquisition. As revealed in the Morpheus Research Report, MER did not have any employees at the time of its acquisition,

and its contact address was a residential condominium in Houston. The Morpheus Research Report further alleged that Tuma was able to circumvent creditworthiness issues by joining MER. Specifically, the Morpheus Research Report stated:

> **Part II: How Tuma, A Convicted Felon, And His Partner Parlayed $54.7 Million Of Turbines Into $460 Million In Cash And Stock From Solaris**
>
> Tuma's felony convictions limited his ability to access financing, according to a former Sales Manager of a gas turbine OEM who interacted with him after his release from prison. He told us that:
>
> It was really hard for us at [redacted OEM name] to sell him anything because we couldn't get him financed because of his conviction.
>
> Tuma was able to circumvent his lack of creditworthiness by joining MER, a small local equipment leasing business founded by Johnson just 2 years earlier.
>
> **At The Time Of The Acquisition, Solaris Described MER As A "Premier Provider Of Distributed Power" That Provided "Natural-Gas Powered Mobile Turbines" With A Unique And Successful Team**
>
> **Reality Check: As Of 2023, MER Was A ~$2.5 Million Revenue Equipment Leasing Business Based Out Of A Condo With Zero Employees And No Turbine Assets**
>
> *    *    *
>
> MER appears, however, to have been little more than a shell company that didn't own a single mobile turbine by the end of Q1 2024, according to its financial statements. MER reported just $2.46 million in revenue in 2023, primarily from leasing switchgear equipment rather than deploying mobile turbines. The company had total equity of just $5.3 million at the end of that year.
>
> Furthermore, Solaris' proxy statement revealed that MER had no employees at the time of its acquisition by the Company and, in fact, never had any.
>
> After Solaris announced the acquisition in July 2024, MER listed its "contact" and "principal executive office" address as 2929 Buffalo Speedway, Suite A1024, Houston, Texas, per an archived version of its website from August 1, 2024, and a proxy statement filed by Solaris:



(Website Archive August 1, 2024, Source: _WaybackMachine_)

This 2929 Buffalo Speedway address is a high-rise residential building in Houston, Texas, with unit number "A1204" being a 3-bedroom condo. The property is owned by Johnson's son, Sean G. Johnson[.]

75.    The Morpheus Research Report would continue to reveal that "despite appearing as nothing more than a small, local switchgear rental business at the end of 2023, MER's business seemingly transformed throughout the first half of 2024 – just months before it was acquired by Solaris." The Morpheus Research Report stated that in the months leading up to the acquisition, MER had acquired substantially all of its turbines by financing through the $71 million in debt that Solaris would later pay in the acquisition, stating:

**MER Transformed In The First Half Of 2024 – Winning Its First Data Center Contract, Securing A 153MW Fleet Of Turbines, And Placing Orders For New Turbines**

**The Turbines And Deposits For New Turbines Were Covered Through $71 Million In Debt Financing And A $54.7 Million "Property & Equipment" Contribution From Tuma & His Affiliates, Per An Industry Expert**

**The $71-Million Debt Was Paid Down By Solaris**

Despite appearing as nothing more than a small, local switchgear rental business at the end of 2023, MER's business seemingly transformed throughout the first half of 2024 – just months before it was acquired by Solaris.

By March 2024, MER had entered into a revenue contract with a data center worth $39 million that represented 16x its previous year revenue, according to its financial statements.[9]

By June 30, 2024, MER had come into possession of $88.6 million worth of turbines, with another $42.3 million of new turbines on order, accounted for as "construction in progress," according to its financial statements:[10]

**MER's Property And Equipment, As of March 31, 2024 Showing No Turbines**

| | March 31, 2024 | December 31, 2023 |
|---|---|---|
| Switchgear equipment | $4,506,500 | $4,506,500 |
| Trailers | 87,000 | 87,000 |
| Other ancillary equipment | 127,500 | 127,500 |
| Total property and equipment | 4,721,000 | 4,721,000 |
| Less: accumulated depreciation | (930,296) | (813,996) |
| | $3,790,704 | $3,907,004 |

**MER's Property And Equipment, As of June 30, 2024 Showing $88 Million Worth Of Turbines And $42 Million Worth Of Deposits**

| | June 30, 2024 | December 31, 2023 |
|---|---|---|
| Turbines | $ 88,686,000 | $ — |
| Switchgear equipment | 4,506,500 | 4,506,500 |
| Trailers | 222,120 | 87,000 |
| Other ancillary equipment | 869,400 | 127,500 |
| Finance lease assets | 314,198 | — |
| Construction in progress | 42,312,000 | — |
| Total property and equipment | 136,910,218 | 4,721,000 |

(Source: MER financial statements as of March 31, 2024 and June 30, 2024)

MER received some of these turbines via a $54.7 million "property and equipment" contribution from one of its owners. The remaining ~$71 million was financed through debt, according to MER financial statements as of June 30, 2024.[11]

| | | |
|---|---|---|
| Cash flows from financing activity: | | |
| Distributions to members | (1,000,000) | — |
| Net cash used in financing activity | (1,000,000) | — |
| Net change in cash | 1,988,975 | 970,912 |
| Cash, beginning of period | 943,275 | 583,014 |
| **Cash, End of Period** | **$ 2,932,250** | **$1,553,926** |
| Non-cash operating, financing and investing activities: | | |
| Right-of-use assets acquired from operating lease | $ 413,627 | $ — |
| Right-of-use assets acquired from finance lease | 314,198 | — |
| Property and equipment accrued in accounts payable | 33,669,855 | — |
| Additions to property and equipment through contributions from members | 54,700,000 | — |
| Additions to property and equipment paid by members through related party debt | 37,102,000 | — |

$70.7 million

(Source: ME's Cash Flow Statement for 1H 2024)

The $54.7 million contribution from one of MER's owner mirrors the value of Tuma's pay out from Goldfinch, suggesting that Tuma may have used his payout from LCP to acquire more turbines and contribute them to MER.

An industry expert familiar with the deal told us that Tuma had gotten a "settlement" from LCP and that he plunged "all the money into an order" for more turbines.

At acquisition, Solaris paid down all of MER's $71 million debt from its initial acquisition of turbines, according to a current report filed by Solaris on September 17, 2024. This indicates that Tuma and his partner's primary contribution to the business was $54.7 million worth of turbines, as well as ~$5 million in assets from the legacy MER business.[12] (1, 2)

76.    The Morpheus Research Report would further detail how despite assurances to investors that MER had a "contracted and diversified earnings stream," MER actually had only one data center customer, stating:

**At Acquisition, Solaris Paid Tuma And His Affiliate $60 Million In Cash And ~16.5 Million Shares, Worth ~$186 Million At Closing And Approximately $400 Million Today**

**Ultimately, Solaris Doubled Its Leverage To Pay 3.19x Book Value For A Commoditized Business With One Data Center Customer**

Solaris' acquisition of MER resulted in a significant windfall for Tuma and Johnson, the only two members of MER at the time the acquisition was announced.

Solaris paid $60 million in cash and 16.46 million shares – worth $186.4 million at the time of closing and closer to approximately $400 million as of the date of this report. The price paid significantly outweighs the value of the assets acquired, especially considering that Solaris immediately depreciated MER's assets by ~$10.6 million upon acquisition.[13]

Solaris effectively doubled its leverage to acquire MER. Furthermore, the Company paid a rich book-value multiple of 3.19x for a business that offered little to no differentiation from its competitors. All this for a single data center relationship.[14]

77.    The Morpheus Research Report additionally detailed how Solaris appeared to "have inflated short term profitability through basic accounting games" including "depreciating its gas turbines assuming they have a useful life of 25 years" when competitors operating similar turbines had estimated a useful life of approximately 8.5 years.

**Solaris Depreciates Its Turbines Assuming They Have A Useful Life Of 25 Years — Inflating Short-Term Profitability**

45

**The Founder Of A Solaris Competitor Told Us His Company Was Modeling A Maximum Of 2.5 Overhauls For Turbines And Generators, Implying A Maximum Useful Life Of ~10 Years For Gas Turbines**

**Aggreko, A Direct Competitor Of Solaris, Depreciates Its Equipment Over A Maximum Of 12 Years**

An easy way for a capital-intensive business to inflate its current period profitability is to extend the useful life of assets beyond that of peers and industry norms in order to lower yearly depreciation rates — as it seems Solaris is doing by choosing a 25-year useful life for its turbines and straight line depreciation method, according to its most recent annual report.

Given that Solaris' turbines need extensive overhaul at least every 4 years, costing up to ~50% of the unit cost, the Company might have to spend more than the unit cost after 2 overhauls. In line with that assessment, the founder of a Solaris competitor with a fleet of gas turbines and generators told us that his Company was modeling for 2.5 overhauls as the maximum for its turbines or generators:

What we put into our model is, is, you know, we split the baby and then call it 2.5 [overhauls] on average in the aggregate.

Factoring in 2.5 overhauls, Solaris' turbines should have a useful life of around 10 years. At the very least, we can see no justification for the claim of a 25-year lifespan.

Solaris' accounting treatment also appears vastly out of line with global peers. For instance, Aggreko, a business specializing in "rental solutions covering power generation," just as Solaris does, contrasts starkly in determining the useful life of its rental fleet.

By the end of 2020, Aggreko owned a fleet with a total capacity to generate 9,365 MW— including a 1,357 MW capacity from gas engines, according to its 2020 annual report. [20]

Aggreko disclosed an 8-12 year useful life range for its entire rental fleet:

## Property, plant and equipment

Our rental fleet accounts for £793 million, which is around 80% of the net book value of the Group's property, plant and equipment. The majority of equipment in the rental fleet is depreciated on a straight-line basis to a residual value of zero over eight years, with some classes of rental fleet depreciated over 10 and 12 years. The annual fleet depreciation charge of £227 million (2019: £265 million) reflects the estimated service lives allocated to each class of fleet asset. Asset lives are reviewed at the start of each year and changed, if necessary, to reflect their remaining lives in light of technological change, prospective economic utilisation and the physical condition of the assets. As noted on page 25 the Group incurred a net impairment charge of £55 million on total property, plant & equipment. This is explained in Note 7 to the Accounts.

(Source: Agrekko Annual Report, 2020)

This figure is less than half the useful life claimed by Solaris for its mobile gas turbines.

The disparity in how Solaris accounts for the useful life of its power generation units relative to peers suggests that the Company is doing so to inflate its near-term profitability.

**We Estimate That If Solaris Used An Adequate Depreciation Methodology, The Depreciation Charge Associated With Its Turbines Would Increase By ~108%**

We estimate that if Solaris used an adequate depreciation methodology, like its peer Aggreko, Solaris' depreciation expense associated with its turbine fleet would be ~108% higher than its current charge.[21]

In short, we believe Solaris has resorted to accounting machinations to materially inflate its short-term profitability.

78.    On this news, the price per share of Solaris' stock fell $4.15, or 16.9%, from a closing price of $24.61 per share on March 14, 2025 to close at a price of $20.46 per share on March 17, 2025.

### The August 7, 2024 Proxy Statement

79.    In connection with the Company's July 9, 2024 announcement that it had entered into a material agreement to acquire MER, Solaris filed a definitive proxy statement on August 7, 2024 (the "August 2024 Proxy Statement") on Form DEFM14A detailing the then-proposed acquisition of MER.

80.    With regard to MER's management and the company's ability track record of success in the turbine industry, the August 2024 Proxy Statement says the following:

**The Strategy**

MER's growth strategy is based on its superior performance and customized solutions. MER's founders and management team *leverage their long and successful track-record of managing power solutions across a range of end-markets*. MER entered the market through high-end customers that depend on reliable, distributed power for their operations. MER will continue to innovate and improve its performance envelope as well as introducing equipment and services that allow its customers to best benefit from the power solution that meets their needs.

MER will continue to explore growth opportunities in other industries that have a need for reliable, mobile power. MER's product and service offering is appealing to a *diverse set of end-markets and customers* because of its performance and adaptability.

81.    The foregoing statements found in the Company's August 2024 Proxy Statement are false and/or misleading because they fail to disclose or otherwise omit information that: (i) MER lacked a strong track-record or experience in the turbine leasing industry; (ii) MER's co-owner John Tuma had a history of turbine-related fraud and a felony conviction for environmental crimes.

82.    With regard to MER's management, particularly its co-founder John Tuma, the August 2024 Proxy Statement fails to disclose or otherwise omits information relating to Tuma's past felony convictions, environmental crimes, and turbine-related fraud. The foregoing omissions from the Company's August 2024 Proxy Statement are false and/or misleading because they provide an incomplete picture of whether MER's management are a "cultural and operational fit" for Solaris.

83.    The Company's August 2024 Proxy Statement contains misrepresentations and omissions of information pertaining to MER's industry track record, as well as MER's

management and co-founder John Tuma. As a result, the August 2024 Proxy Statement is false and/or misleading because it overstates the positive impact that Solaris' acquisition of MER would have on the Company, as it does not adequately disclose the substantial risks arising out of the foregoing issues.

84.    The August 2024 Proxy Statement solicited shareholders to vote in support of, amongst other items, the issuance of 16,464,778 units of Solaris Class B common stock (the "Stock Issuance Proposal"). These shares of Class B common stock would be used as part of the consideration offered as part of the Contribution Agreement, whereby all issued and outstanding equity interest of MER was to be transferred to Solaris in exchange for:

    i.    $60,000,000 in cash, subject to certain adjustments based on the Company's capital expenditures prior to the completion of the Contribution (including the obligation by Solaris to assume the Company's acquisition of approximately $308 million of on-order turbines) (the "Clos
    ii.    ing Cash Consideration"); and

    iii.    16,464,778 units of Solaris LLC (the "Solaris LLC Units"), and an equal number of shares of Class B common stock, par value $0.00 per share, of Solaris (the "Class B Common Stock"), subject to certain adjustments (the "Closing Equity Consideration," and together with the Closing Cash Consideration, the "Contribution Consideration").

85.    The August 2024 Proxy Statement solicited support for the Stock Issuance Proposal, which was an integral part of the acquisition of MER by Solaris, but did not disclose material information pertaining to the allegations contained herein, particularly that: (i) MER lacked the track record or experience in the turbine leasing industry that MER was touted to have; (ii) MER's co-owner John Tuma had a history of turbine-related fraud and a felony conviction for environmental crimes despite assurances from the Company that MER's management was a "cultural and operational fit;" and (iii) Solaris overstated the positive impact that the acquisition of MER would have on the Company as a result of the foregoing undisclosed issues.

86.     The Individual Defendants knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, approval of the Stock Issuance Proposal, which was a necessary component of the acquisition of MER by Solaris.

## STOCK REPURCHASES DURING THE RELEVANT PERIOD

87.     Throughout the Relevant Period, the Individual Defendants caused the Company to repurchase its own common stock at artificially inflated prices. The damage done to the Company as a result of their improvident stock repurchases is also a direct result of the Individual Defendants' misconduct during the Relevant Period, as such misconduct was responsible for artificially inflating the price of Solaris' common stock. In the aggregate, the Company spent approximately $10.2 million to repurchase approximately 300,197 shares of its own common stock at artificially inflated prices between November 2024 and March 2025.

88.     In Solaris' Form 10-K for the year 2024, the Company disclosed that it had repurchased 3,153 shares of its own common stock between November 1, 2024 and November 30, 2024 at an average price per share of approximately $20.86. The aggregate cost of these stock repurchases was $65,771.58.

89.     In Solaris' Form 10-Q filed on May 7, 2025, the Company disclosed that it had repurchased 93 shares of its own common stock between February 1, 2025 and February 28, 2025 at an average price per share of approximately $30.02. The aggregate cost of these stock repurchases was $2,792.

90.    In Solaris' Form 10-Q for 1Q 2025, the Company disclosed that it had repurchased 296,951 shares of its own common stock between March 1, 2025 and March 31, 2025 at an average price per share of approximately $34.08. The aggregate cost of these stock repurchases was $10,120,090.[5]

91.    Thus, in the aggregate, throughout the Relevant Period the Company spent approximately $10.2 million on stock repurchases while the price of Solaris stock was artificially inflated due to Defendants' false and/or misleading statements and omissions.

## DAMAGES TO THE COMPANY

92.    Solaris has been, and will continue to be, severely damaged and injured by the Defendants' misconduct. As a direct and proximate result of the Defendants' conduct, Solaris has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

    a.   costs incurred in compensation and benefits paid to Defendants that violated federal securities laws;

    b.   substantial loss of market capital;

    c.   costs already incurred and to be incurred defending the pending securities fraud class action lawsuit; and

    d.   any fines or other liability resulting from the Company's violations of federal law.

93.    In addition, Solaris' business, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired. The credibility and motives of management are now in serious doubt.

---

[5] Upon information and belief, these stock repurchases were made during the Relevant Period.

94.     The wrongdoing complained of herein has irreparably damaged Solaris' corporate image and goodwill. For at least the foreseeable future, Solaris will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Solaris' ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

95.     Plaintiff brings this action derivatively in the right and for the benefit of Solaris to redress injuries suffered, and to be suffered, by Solaris as a direct result of violations of federal securities laws by the Defendants. Solaris is named as a Nominal Defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

96.     The Board of Solaris, at the time this action was commenced, consisted of Defendants Zartler, Brock, Durrett, Burke, Argo, Giesinger, Keenan, Teague, Walker, and Yzaguirre a total of ten (10) individuals.

97.     Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Solaris Board would be futile, and therefore, excused. This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

98.     Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and

prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

99.     Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

### Demand is Futile as to Defendants Zartler and Brock Because of Their Principal Professional Occupations as the Company's co-CEOs

100.     Defendant Zartler had served as the Company's CEO since 2018 and a member of the Board since 2017 and is now co-CEO alongside Defendant Brock who was brought on as a member of the Board and as co-CEO on October 16, 2025. As co-CEO of the Company, it is reasonable to infer that, due to the importance of the Company's acquisition of MER, Defendant Zartler would have been aware of the fact that: (i) MER lacked the track record or experience in the turbine leasing industry that MER was touted to have; (ii) MER's earnings stream was not diversified, and actually came predominantly from only one client; (iii) MER's co-owner John Tuma had a history of turbine-related fraud and a felony conviction for environmental crimes despite assurances from the Company that MER's management was a "cultural and operational fit;" (iv) Solaris overstated the positive impact that the acquisition of MER would have on the Company as a result of the foregoing undisclosed issues; and (v) Solaris overstated its total assets and near-term profitability in its financial reports as a result of the Company's failure to properly depreciate MER's turbines in accordance with industry standards. In his role as CEO of the Company for the fiscal year 2024, Defendant Zartler received $3,820,166 in total compensation. The Company does not claim that Defendants Zartler and Brock are independent directors and because their primary source of income and primary employment are as the co-CEOs of Solaris,

and thus their professional reputations are inextricably bound to their roles at Solaris, Defendants

Zartler and Brock are incapable of acting independently and demand is futile upon them.

### Demand is Futile as to Defendant Durrett Because of Her Principal Professional Occupation as the Company's Chief Administrative Officer

101.     Defendant Durrett has served as the Company's Chief Administrative Officer since

2017 and has been a member of the Board since 2019. In her role as Chief Administrative Officer

of the Company for the fiscal year 2024, Defendant Durrett received $1,233,340 in total

compensation. The Company does not claim that Defendant Durrett is an independent director and

because her primary source of income and primary employment is as the Company's Chief

Administrative Officer, Defendant Durrett is incapable of acting independently and demand is

futile upon her.

### Demand is Futile as to the Audit Committee Defendants

102.     Demand is futile as to Defendants Argo, Giesinger, and Yzaguirre (the "Audit

Committee Defendants") as members of the Audit Committee for their knowing failure to fulfill

their responsibilities.

103.     The Board of Directors adopted an Audit Committee Charter, setting forth the

responsibilities of the Audit Committee. The duties of the Audit Committee are set forth herein,

*supra*.

104.     Upon information and belief, in their capacity as members of the Audit Committee,

the Audit Committee Defendants were privy to specific information related to the Company's

business, operations, and prospects, which would reasonably put them on notice that the statements

set forth above in the Company's public filings were materially false and misleading when made.

105.     The Company's public filings concerning the Company's business and prospects

during the Relevant Period contained materially misleading information and/or omitted material

information concerning the Company's acquisition of MER, including: (i) MER's lack of industry track record and experience; (ii) information pertaining to John Tuma's history of turbine-related fraud and his past felony conviction; (iii) the fact that 96% of MER's revenue came from a single client rather than a diverse client-base; (iv) overstatements of the commercial prospects of acquiring MER; and (v) overstatements of Solaris' total assets and near-term profitability due to the failure to depreciate MER's turbines in accordance with industry standards. By allowing documents to be filled with misleading information, the Audit Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested. Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

### Demand is Futile as to the Director Defendants

106.    Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Company's Board would be futile, and therefore, excused. This is because a majority of the Board faces a substantial likelihood of liability as a result of their knowing toleration of the above described false and misleading statements and omissions of material adverse facts, which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

107.    Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

108.    Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material omissions

described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

109.    Accordingly, the Director Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartially consider a demand to sue themselves in the present action.

**COUNT I**

**Against the Individual Defendants for**
**Violations of Section 14(a) of the Exchange Act**

110.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

111.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

112.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

113.    Under the direction and watch of the Individual Defendants, the August 2024 Proxy

Statement failed to disclose that: (i) MER lacked the track record or experience in the turbine leasing industry that MER was touted to have; (ii) MER's co-owner John Tuma had a history of turbine-related fraud and a felony conviction for environmental crimes despite assurances from the Company that MER's management was a "cultural and operational fit;" and (iii) Solaris overstated the positive impact that the acquisition of MER would have on the Company as a result of the foregoing undisclosed issues.

114.    The Individual Defendants knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, approval of the Stock Issuance Proposal, which was a necessary component of the acquisition of MER by Solaris.

115.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the August 2024 Proxy Statement.

116.    Plaintiff on behalf of Solaris has no adequate remedy at law.

## COUNT II

### Against the Securities Action Defendants for
### Contribution Under Section 10(b) of the Exchange Act,
### Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act

117.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

118.    As a result of the conduct and events alleged above, Solaris has been named as a defendant in the Related Securities Action brought on behalf of Solaris shareholders in which it is a joint tortfeasor in claims brought under Section 10(b) of the Securities and Exchange Act and

Rule 10(b)-5 promulgated thereunder.

119.    Federal law provides Solaris with a cause of action against other alleged joint tortfeasors under Rule 10b-5. In particular, under the Supreme Court's decision in *Musick, Peeler & Garrett v. Employers Insurance of Wausau*, 508 U. S. 286, Solaris has a federal law right of contribution against joint tortfeasors under Rule 10b-5. Section 21D(f) of the Securities and Exchange Act further sets forth specific provisions entitling Solaris to contribution against all joint tortfeasors under Rule 10b-5, regardless of whether they have been named as defendants in the currently pending Related Securities Action and sets forth specific rules regarding the determination of claims for such contribution.

120.    Accordingly, Plaintiff, on behalf of Solaris, hereby claims contribution against the Securities Action Defendants, each of whom has been named in the currently pending Related Securities Action as a joint tortfeasor with Solaris under Rule 10b-5, or if joined in such actions, would be liable for the same damages as Solaris.

121.    Solaris claims no right to indemnification under the federal securities laws from them in this count, but rather only claims contribution.

**Allegations Regarding the Securities Action Defendants**

122.    Throughout the Relevant Period, the Securities Action Defendants caused the Company to issue false and misleading statements and/or omit material information in public statements and/or Company filings concerning the Company's business and financial prospects. These statements were materially misleading to persons who purchased Solaris securities during the Relevant Period.

123.    The plaintiffs in the Related Securities Action allege that they relied, directly or indirectly, upon these false statements and misleadingly omissive disclosures in purchasing Solaris

securities, and, as a result, suffered damages because value of their investments was distorted by the false and materially omissive statements, and they purchased such securities at such distorted prices.

124.    The damages suffered by said investors were caused by reason of the fact that: (i) they were induced to purchase said securities by the false and misleading statements alleged herein, and (ii) the reveal of the true nature of the Company's business and prospects resulted in the decrease in price of its securities, causing the value of shareholders investments to drop.

125.    The plaintiffs in the Related Securities Action were unaware of the false and misleading nature of said statements and omissive disclosures.

126.    When the Securities Action Defendants signed off on or made the false statements and omissive disclosures detailed herein, they had actual knowledge that they were false and misleading. As alleged in detail herein, due to their positions as employees and/or directors of Solaris, the Securities Action Defendants were privy to information regarding the Company's business and financial prospects and would have been aware that the statements made were in fact false and misleading when made.

127.    Accordingly, the Securities Action Defendants are liable for damages under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and, if Solaris were to be held liable in the Related Securities Action, the Securities Action Defendants would be liable to it for contribution. Plaintiffs hereby derivatively claim such right of contribution on behalf of Solaris.

## Allegations Regarding the Securities Action Defendants as Control Persons

128.    In acting as alleged above, the Securities Action Defendants were acting as authorized agents of Solaris in their roles as directors and/or employees. Because of their positions of control and authority as senior officers and/or directors, the Securities Action Defendants were

able to, and did, control the contents of the various reports, press releases and public filings disseminated by the Company throughout the Relevant Period, as alleged herein.

129.　　The Securities Action Defendants were "controlling persons" of Solaris within the meaning of Section 20(a) of the Exchange Act, and, accordingly, the Securities Action Defendants could be held liable to the plaintiffs in the Related Securities Action. Were the Company to be held liable in said Related Securities Action, the Securities Action Defendants would be liable to it for contribution.

130.　　Plaintiff hereby derivatively claims such right of contribution on behalf of Solaris.

## COUNT III

### Against the Insider Selling Defendants for Breach of Fiduciary Duty of Insider Trading and Misappropriation of Information

131.　　Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

132.　　The Insider Selling Defendants (defined supra), throughout the Relevant Period, engaged in the sale of Company stock at artificially inflated prices while in possession of material information that had yet to be released to the investing public. The Insider Selling Defendants engaged in this course of conduct to keep the public unaware of the adverse information affecting the Company's stock price and benefitted to the detriment of the investing public and the Company itself.

133.　　This proprietary, non-public information concerning the Company's business and prospects was known by the Insider Selling Defendants, who sold substantial amounts of their shares in Solaris stock during the period Defendants' fraud was ongoing. These sales were made for Defendants own self-interests, at the expense of Solaris and the investing public.

134.　　By selling the Company's common stock while in possession of this information

60

and failing to fully inform the investing public, the Insider Selling Defendants breached their fiduciary duties of good faith and loyalty to the Company.

135.    As such, the Insider Selling Defendants are legally responsible to the Company for the significant profits they received from their sales of Solaris' stock.

## COUNT IV

### Against the Individual Defendants for Breaches of Fiduciary Duty

136.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

137.    The Individual Defendants owed and owe Solaris fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Solaris the highest obligation of good faith, loyalty, and due care.

138.    The Individual Defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate to Solaris shareholders materially misleading and inaccurate information through the Company's SEC filings throughout the Relevant Period. These actions could not have been a good faith exercise of prudent business judgment.

139.    During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Solaris to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to Solaris and its shareholders. As a result, the Individual Defendants grossly mismanaged the Company.

140.    As a direct and proximate result of the Individual Defendants' failure to perform

their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

141.    Plaintiff, on behalf of Solaris, has no adequate remedy at law.

## COUNT V

### Against all the Individual Defendants for Unjust Enrichment

142.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

143.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Solaris.

144.    The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Solaris.

145.    Plaintiff, as a shareholder and representative of Solaris, seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and breaches of fiduciary duty.

146.    Plaintiff, on behalf of Solaris, has no adequate remedy at law.

## COUNT VI

### Against the Individual Defendants for Abuse of Control

147.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

148.    The Individual Defendants have taken advantage of their positions as officers and/or directors of the Company to the detriment of Solaris and the investing public by causing

the Company to issue materially misleading statements and/or omitting material information concerning the reporting of the Company's financials and lack of related internal control.

149.    As such, the Individual Defendants have abused their positions of control with the Company and are legally responsible.

150.    Thus, for the aforementioned reasons, the Individual Defendants are liable to the Company for their wrongdoing.

## COUNT VII

### Against the Individual Defendants for Gross Mismanagement

151.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

152.    The Individual Defendants owed a duty of oversight to the Company in which they were responsible to ensure that the Company maintained adequate reporting controls for all financial, accounting and disclosure released by the Company. Furthermore, the Defendants were responsible to oversee, manage and control the operations of the Company, including the manners and methods of reporting in which the acts complained herein occurred.

153.    Through the wrongful acts complained of herein, the Individual Defendants refused or did not properly discharge their responsibilities to the Company and its shareholders in a prudent manner as prescribed by law as well as in the Company's corporate governance regulations.

154.    By committing the misconduct alleged herein, the Individual Defendants breached their fiduciary duties of due care, diligence and candor in the management and administration of Solaris' affairs and in the use and preservation of Solaris' assets.

155.    During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet

the Individual Defendants caused Solaris to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to Solaris, thus breaching their duties to the Company.

156.    As a result, the Individual Defendants grossly mismanaged Solaris and should be liable to the Company for the resulting damages.

## COUNT VIII

### Against the Individual Defendants for Waste of Corporate Assets

157.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

158.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Related Securities Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

159.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

160.    Plaintiff, on behalf of Solaris, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Solaris and that Plaintiff is an adequate representative of the Company;

B.    Determining and awarding to Solaris the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together

64

with interest thereon;

C.     Directing Solaris and the Director Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Solaris and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

(1)     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

(2)     a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

D.     Determining and awarding to Solaris exemplary damages in an amount necessary to punish Defendants and to make an example of Defendants to the community according to proof at trial;

E.     Awarding Solaris restitution from Defendants, and each of them;

F.     Awarding Solaris Contribution from Securities Action Defendants, and each of them;

G.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H.     Granting such other and further equitable relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: December 10, 2025.                    Respectfully submitted,

By: */s/Roger L. Mandel*
Roger L. Mandel
TBN: 12891750
Mandel Law Group
3416 Pelham Rd.
Fort Worth, TX 76116
(214) &62-1036
rogerlmandel@gmail.com

Joshua M. Lifshitz
(pro hac vice application to be filed)
**LIFSHITZ LAW PLLC**
1190 Broadway
**Hewlett, NY 11557**
Telephone: (516) 493-9780
Facsimile: (516) 280-7376

*Attorneys for Plaintiff*